UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| RANDY MCGOWAN, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil No. 07-01-B-W |
| | ) | |
| WARDEN, MAINE STATE PRISON, | ) | |
| | ) | |
| Respondent | ) | |

**RECOMMENDED DECISION ON 28 U.S.C. § 2254 PETITION**

Randy McGowan is the petitioner in this 28 U.S.C. § 2254 proceeding. Following a stay of this action to allow him to complete state-court review of his second state post-conviction petition, his amended petition is now ready for resolution. Accused of the shooting death of his former girlfriend's boyfriend, McGowan was convicted by a jury of one count of murder.  The Maine Law Court affirmed the conviction following McGowan's direct appeal.  Following two evidentiary hearings, McGowan obtained state post-conviction relief as to two grounds, although the Superior Court Justice denied relief on fifteen other grounds raised by McGowan.  The State of Maine appealed.  The Law Court vacated that judgment with an order remanding the case for entry of judgment denying the petition.  McGowan filed a second post-conviction which was summarily dismissed and which McGowan attempted to appeal to the Law Court.  The Law Court refused to issue a certificate of probable cause.  McGowan is now serving a twenty-eight-year prison term.  There are twenty-five grounds in McGowan's amended 28 U.S.C. § 2254 petition. The State responds that many of these grounds are not properly exhausted or procedurally barred and that those that are properly before the court cannot survive the deferential review of the state court's determination under § 2254(d).

For the reasons explained below, I recommend that the Court deny McGowan § 2254 relief.  However, in the event McGowan seeks to appeal the Court's determination, I recommend that the Court grant a certificate of appealability on the question of whether or not there was a Sixth Amendment violation when his attorney failed to present expert testimony apropos the blood spatter patterns that would have supported McGowan's otherwise uncorroborated self-defense narrative and/or for failing to establish his client's lack of prior homicide and felony convictions after defense counsel asked a question suggestive of such a record.

## Discussion

### The 28 U.S.C. § 2254(b) Exhaustion Requirement

Congress has provided that a 28 U.S.C. § 2254 petitioner must fully exhaust his or her remedies in the state court prior to turning to the federal courts for habeas relief:

> **(b)(1)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--
>> **(A)** the applicant has exhausted the remedies available in the courts of the State; or
>> **(B)(i)** there is an absence of available State corrective process; or
>> **(ii)** circumstances exist that render such process ineffective to protect the rights of the applicant.
> **(2)** An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.
> **(3)** A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

28  U.S.C. § 2254(b).

### Standard for 28 U.S.C. § 2254 Review of State Court Determinations

Under the Anti-Terrorism and Effective Death Penalty Act (AEDPA):

> if a state court has adjudicated a habeas petitioner's claim on the merits, a federal court may issue the writ only if the state court's adjudication

resulted in a decision that "was contrary to" clearly established federal law, involved an "unreasonable application" of clearly established federal law, or was based on an "unreasonable determination of the facts in light of the evidence presented." 28 U.S.C § 2254(d).

A state court's decision is contrary to clearly established federal law if the state court arrives at a conclusion opposite from that reached by the U.S. Supreme Court on a question of law, or if the state court decides the case differently than the U.S. Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 405 (2000).

A state court's decision unreasonably applies clearly established federal law if the state court correctly identifies the governing legal principles, but (i) applies those principles to the facts of the case in an objectively unreasonable manner; (ii) unreasonably extends clearly established legal principles to a new context where they should not apply; or (iii) unreasonably refuses to extend established principles to a new context where they should apply. L'Abbe v. DiPaolo, 311 F.3d 93, 96 (1st Cir.2002) (citing Williams, 529 U.S. at 407). If the state court does not expressly apply the federal standard but resolves the issue under a state law standard that is more favorable to defendants than the federal standard, then the reviewing court "will presume the federal law adjudication to be subsumed within the state law adjudication." Teti v. Bender, 507 F.3d 50, 54-55 (1st Cir.2007) (quoting McCambridge v. Hall, 303 F.3d 24, 35 (1st Cir.2002)). To be unreasonable, the state court's application of existing legal principles must be more than merely erroneous or incorrect. Williams, 529 U.S. at 411. "We agree with the Second Circuit that 'some increment of incorrectness beyond error is required.' Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir.2000). The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court." McCambridge, 303 F.3d at 36.

In reviewing a habeas corpus petition under AEDPA, a federal court will presume that the state court's findings of fact are correct. For this purpose, the term "facts" refers to "basic, primary, or historical facts," such as witness credibility and recitals of external events. Sanna v. DiPaolo, 265 F.3d 1, 7 (1st Cir.2001) (quoting Bryson v. Ward, 187 F.3d 1193, 1211 (10th Cir.1999)). The habeas petitioner may defeat the presumption of correctness only with clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); see also Ouber v. Guarino, 293 F.3d 19, 27 (1st Cir.2002). The presumption of correctness is equally applicable when a state appellate court, as opposed to a state trial court, makes the findings of fact. Norton v. Spencer, 351 F.3d 1, 6 (1st Cir.2003) (quoting Sumner v. Mata, 455 U.S. 591, 593 (1982)).

Sleeper v. Spencer, 510 F.3d 32, 37-38(1st Cir. 2007).   See also Knight v. Spencer, 447

F.3d 6, 15 (1st Cir. 2006); Smiley v. Maloney, 422 F.3d 17 (1st Cir. 2005); Mello v.

DiPaulo, 295 F.3d 137, 142-43 (1st Cir. 2002); Vieux v. Pepe, 184 F.3d 59, 63-64 (1st Cir. 1999).

**The Grouping of McGowan's Grounds**

In its memorandum responding to McGowan's amended petition, the State of Maine has summarized and grouped McGowan's twenty-five grounds in a very efficient manner.  In his reply memorandum, McGowan responds:

> I submit that the State's separation of Grounds 2-24 into two groups in its answer of 2 and 3 is inappropriate.  Although all the grounds are connected to establish that the State procedures are ineffective in protecting my rights they should be considered separately on their individual merits.  Regardless, I will address the State's answers as they are submitted.

(Reply Mem. at 1.)   McGowan does not argue that the State overlooked any of his claims or mischaracterized the overlaps between the claims in his first petition and those in his amended petition.[1]  The discussion below explains why the grouping is appropriate with respect to grounds that McGowan has not properly exhausted in his state court proceedings and with regards to his claims that pertain to his second state post-conviction proceedings.   I do address those grounds that are ripe for federal 28 U.S.C. § 2254 review on their merits.

*1.*     *Direct Appeal  - Ground 11*

In his eleventh ground McGowan challenges the Maine Law Court's conclusion in its decision on direct appeal approving of the trial court's jury instructions on self-defense and defense of the premises.  McGowan asserts here that these instructions violated his right to due process of law.

---

[1]     I refer to the ground numbers in the amended petition which are often no more than cross-references to McGowan's original petition.  Given the number of grounds involved here it would only serve to confuse matters if I were to set forth the number associated with the ground in the initial petition.

In his brief to the Maine Law Court on direct appeal, McGowan raised a challenge to the jury instructions as one of four grounds. (Appellant Br. at 3-5, State App. B.) Counsel argued that the Superior Court erred in its jury instructions regarding the statutory defenses found in 17-A M.R.S. § 108(2)(B) and 17-A M.R.S. § 104(3). In addition to the statutes he cited one Maine case, State v. Sprague, 617 A.2d 564 (Me. 1992), which was an obvious error challenge to the 17-A M.R.S. § 108(2)(B) instruction. In Sprague the Law Court concluded that the defendant was denied "a fair trial" due to the failure of instructions to "ensure consideration of all the relevant defenses available to him." 617 A.2d at 565. This section of McGowan's appellate brief ends with: "The Court's instruction was clearly contradictory to the intent of the statutes, deprived the appellant of a fundamentally fair trial and was obvious error." (Appellant Br. at 6.) With regards to this claim, in its memorandum of decision the Maine Law Court indicated: "Contrary to McGowan's contention, the trial court did not commit obvious error in its jury instructions, see State v. Uffelman, 626 A.2d 340, 342 (Me. 1993)…" (Sept. 13, 2000, Mem. Dec. at 1, State App. at B.)[2]

The State's position here is that McGowan's argument on direct appeal did not alert the Law Court to the constitutional, due process dimensions of this claim, but was really framed as a challenge under Maine Law. On this requirement, Baldwin v. Reese explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the " ' "opportunity to pass upon and correct" alleged violations of its prisoners' federal rights.' " Duncan v. Henry, 513 U.S. 364, 365 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his

---

[2]     Uffleman, like Sprague, addressed a challenge to jury instructions under state law, including 17-A M.R.S. § 108(2)(C), applying the obvious error standard.

> claim in each appropriate state court (including a state supreme court with
> powers of discretionary review), thereby alerting that court to the federal
> nature of the claim. Duncan, supra, at 365-366; O'Sullivan v. Boerckel, 526
> U.S. 838, 845 (1999). This case focuses upon the requirement of "fair
> presentation."

541 U.S. 27, 29 (2004).  The Court further observed:

> A litigant wishing to raise a federal issue can easily indicate the federal law
> basis for his claim in a state-court petition or brief, for example, by citing
> in conjunction with the claim the federal source of law on which he relies
> or a case deciding such a claim on federal grounds, or by simply labeling
> the claim "federal."

Id. at 32.  See also Clements v. Maloney, 485 F.3d 158, 162 (1st Cir. 2007) ("It is,

however, clearly inadequate to simply recite the facts underlying a state claim, where

those facts might support either a federal or state claim.")(citing Martens v. Shannon, 836

F.2d 715, 717 (1st Cir.1988)).

The concern with respect to this ground and 28 U.S.C. § 2254 review is whether

or not McGowan adequately apprised the Maine Law Court that there was a federal

constitutional dimension to this challenge.  This is a "fairly presented" inquiry that is very

similar to the one I addressed in Cormier v. Maine, Civ. No. 04-112-B-W, 2004 WL

2315275 (D. Me. Oct. 13, 2004) (recommended decision), aff'd, 2004 WL 2595862 (D.

Me. Nov. 15, 2004).  Analyzing a challenge to accomplice liability instructions there, I

concluded:

> Just as the Reese Court rejected the argument that "ineffective" is
> a word of art describing a federal ineffective assistance of counsel
> constitutional claim, see Reese, 541 U.S. at [33], I reject the argument that
> the terms "substantial prejudice" and "fair trial" are terms of art that are
> adequate substitutes for expressly articulating a claim for denial … of due
> process under the United States Constitution.

Id. at *4.  Had McGowan articulated a federal right or cited to a case such as Neder v.

United States, 527 U.S. 1, 8-12 (1999),  Johnson v. United States, 520 U.S. 461, 468,

(1997), and/or  United States v. Olano, 507 U.S. 725 (1993) then he may well have

crossed the "fairly presented" threshold, but he did not.  Compare Dye v. Hofbauer, 546

U.S. 1, 3-5 (2005); Goodrich v. Hall, 448 F.3d 45, 47-48 (1st Cir. 2006).

**2.      *First Post-conviction Review Proceedings***

McGowan has twelve grounds that pertain to his first post-conviction proceedings.

**a.   *Grounds 10, 12, 13, 14, 15, 18, 19, 20, 21, 23***

Ten of McGowan's 28 U.S.C. § 2254 grounds in this cluster have not been

exhausted.  These are:

- 10.  The right to effective assistance of counsel at trial and on direct appeal and his right to due process of law were violated because trial counsel had a conflict of interest, failed to move to suppress his statements, failed to object to a Doyle v. Ohio violation, failed to object to jury instructions, and failed to consult and retain experts or hire a private investigator and to present lay witnesses.
- 12. The Superior Court "abused its discretion" during the first post-conviction review proceedings by refusing to accept McGowan's pro se briefs in which he alleged the grounds of ineffective assistance of counsel alleged in ground one of the original 2254 petition.
- 13. The Superior Court's refusal to accept his pro se briefs during the first state post-conviction review proceedings resulted in an ineffective and unfair hearing during that proceeding.
- 14. The Superior Court's denial of his jury instruction and Doyle claims during the first state post-conviction proceedings was based on an erroneous understanding of the facts, error which was uncorrected by that court during the second post-conviction proceedings or by the Maine Law Court when it refused to allow an appeal from the summary dismissal of the second state petition for post-conviction review.
- 15. The Superior Court's denial of grounds twelve (Doyle) and sixteen (conflict) of the amended petition during the first state post-conviction proceedings violated his right to due process of law.
- 18. The Superior Court's refusal to accept his pro se briefs during the first state post-conviction review proceedings resulted in an ineffective and unfair hearing during that proceeding, i.e., a due process violation.
- 19. The Superior Court "abused its discretion" by refusing to replace his post-conviction counsel and allow him to represent himself during the first state post-conviction review proceedings, which resulted in a violation of his right to due process during that proceeding.

- 20. The Superior Court erroneously concluded during the first state post-conviction review proceedings that the trial court (who also was the justice presiding over the post-conviction review) would not have suppressed McGowan's "coerced" statements.
- 21. The Superior Court made an unreasonable determination of the facts in light of the evidence during the first state post-conviction review proceedings regarding the testimony of the expert toxicologists.
- 23. McGowan was fully deprived of his right to counsel during the first state post-conviction review proceedings in the Superior Court.

In his memorandum as appellee to the Maine Law Court, McGowan did not present any challenges to the post-conviction court's denial of relief on these claims.   McGowan has not fully exhausted these claims as required by 28 U.S.C. § 2254(d).  See Jackson v. Coalter, 337 F.3d 74, 85 -87 (1st Cir. 2003) (requiring full and proper exhaustion of § 2254 claims).

### b. Grounds 16 and 17

The State does not dispute that McGowan has fully exhausted his 16th and 17th grounds.  (Mot. Dismiss at 16.)   The predicate of these grounds was laid in his first post-conviction proceeding challenging his attorney's performance during trial.

Ground 16 of the amended 28 U.S.C. § 2254 petition argues that the Maine Law Court's reversal of the state Superior Court's grant of relief on two of his state post-conviction ineffective assistance of counsel claims was incorrect under Strickland v. Washington, 466 U.S. 668, 687-88 (1984).  In Ground 17 of this amended petition McGowan maintains that the Maine Law Court's reversal of the state Superior Court's ineffective assistance of counsel determination was an unreasonable determination of the facts in light of the evidence presented during the state post-conviction proceedings.

The two grounds that the state post-conviction court granted relief on were addressed at some length in the thirty-eight-page decision and order of the Superior Court

Justice.  (See Dec.& Order at 27-38, State App. C.)  As the Maine Law Court rejected this reasoning (rather than elaborating on it), the relevant decision for purposes of this 28 U.S. C. § 2254 review is that of the Maine Law Court's.  See Ylst v. Nunnemaker, 501 U.S. 797, 805-06 (1991).[3]

In its brief to the Maine Law Court, the State characterized his two arguments thusly:

> I.      The postconviction justice's legal conclusions that McGowan met his burden of establishing that trial counsel's cross-examination of Jamie Merrill constituted ineffective assistance of counsel and that McGowan was prejudiced by the cross examination were incorrect.
>
> II.     The postconviction justice's factual finding that defense blood spatter expert Ross Gardner's testimony would have corroborated McGowan's trial testimony is clearly erroneous; thus, his legal conclusion flowing from the factual finding, that McGowan met his burden of establishing that trial counsel's failure to consult with or retain a blood spatter expert constituted ineffective assistance of counsel, was incorrect.

(Appellant Br. at 1, State App. D.)  McGowan, of course, argued that the Superior Court justice was correct in making these two determinations.

Prior to addressing the particulars of these two issues, the Maine Law Court explained the substantive law it would apply, a matter very relevant to this Court's 28 U.S.C. § 2254 review.  The Maine Law Court articulated the ineffective assistance of counsel standard as follows:

> The Sixth Amendment to the United States Constitution and article I, section 6 of the Maine Constitution ensure that a criminal defendant is entitled to receive the effective assistance of an attorney. The U.S. Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence," U.S. CONST. amend VI, while the Maine Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall have a right to be heard by the accused and counsel to the accused." ME. CONST.

---

[3]      In the discussion below I do set forth portions of the post-conviction court's opinion because of the obvious relevance the findings and reasoning of the post-conviction court have vis-à-vis the findings and reasoning of the Maine Law Court in overturning the lower court's grant of relief.

art. I, § 6 (2005). The primary purpose of the effective assistance of counsel requirement is to ensure a fair trial. Strickland v. Washington, 466 U.S. 668, 685-86 (1984); Aldus v. State, 2000 ME 47, ¶ 15, 748 A.2d 463, 468.

The Supreme Court and this Court have enunciated two-prong tests for adjudicating ineffective assistance of counsel claims. The Supreme Court's test, as set forth in Strickland, holds that:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction ... has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687.

Similarly, our test, first articulated in Lang v. Murch, 438 A.2d 914, 915 (Me.1981), was recently expressed as:

> [F]irst, whether there has been serious incompetency, inefficiency, or inattention of counsel amounting to performance ... below what might be expected from an ordinary fallible attorney; and second, whether any such ineffective representation likely deprived the defendant of an otherwise available substantial ground of defense.

Aldus, 2000 ME 47, ¶ 12, 748 A.2d at 467 (quotation marks omitted).

We have previously noted that the federal and state guarantees are virtually identical. See id. The burden is on the defendant to prove both prongs. See, e.g., State v. Brewer, 1997 ME 177, ¶ 15, 699 A.2d 1139, 1143. Additionally, the test is applied on a case-by-case basis, and evaluations of ineffective assistance of counsel claims are "guided by the overall justness and fairness of the proceeding." Aldus, 2000 ME 47, ¶¶ 14-15, 748 A.2d at 468. See also Roe v. Flores-Ortega, 528 U.S. 470, 485 (2000) ("As with all applications of the Strickland test, the question whether a given defendant has made the requisite showing will turn on the facts of a particular case.").

In applying the test, we begin with the second prong regarding prejudice because if it is determined that there was no prejudice, there is no need to address the first prong regarding whether counsel's performance was deficient. See Pottios v. State, 1997 ME 234, ¶¶ 9-10, 704 A.2d 1221, 1223-24; see also Strickland, 466 U.S. at 697 (holding that "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one"). With respect to the second prong of the analysis, we have noted that "[t]o establish that he has been deprived of a substantial ground of defense, [the petitioner] must demonstrate that trial counsel's performance likely affected the outcome of the trial." Whitmore v. State, 670 A.2d 394, 396 (Me.1996). Similarly, in Strickland, the Supreme Court noted that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. The reasonable probability requirement of the second prong means "a probability sufficient to

> undermine confidence in the outcome." <u>Aldus</u>, 2000 ME 47, ¶ 20, 748 A.2d
> at 471 (quotation marks omitted); <u>see</u> <u>also</u> <u>Strickland</u>, 466 U.S. at 694 ("A
> reasonable probability is a probability sufficient to undermine confidence in
> the outcome."). Accordingly, "a claim of ineffective assistance of counsel
> requires the defendant to establish that his attorney's performance deprived
> him of a substantial ground of defense, or that counsel's performance likely
> affected the outcome of the trial." <u>Brewer</u>, 1997 ME 177, ¶ 20, 699 A.2d at
> 1144 (citations omitted).

<u>McGowan v. State</u>, 2006 ME 16, ¶¶ 9-13, 894 A.2d 493, 496- 97.

The Maine Law Court's articulation of the ineffective assistance standard was not

contrary to clearly established federal law because the Maine Law Court did not arrive

"at a conclusion opposite from that reached by the U.S. Supreme Court on a question of

law," or "decide the case differently than the U.S. Supreme Court has on a set of

materially indistinguishable facts." <u>Williams</u>,529 U.S. at 405.[4]

There is a bone of contention between the Maine Law Court and the State of Maine in

terms of the standard of appellate review it employs for ineffective assistance of counsel

claims.   On this question raised in the State's appeal of the post-conviction court's grant of

relief, the Maine Law Court opined:

> In contrast with <u>Strickland</u> 's recognition that ineffective assistance of
> counsel claims constitute mixed questions of law and fact, we have reviewed
> the post-conviction court's findings and conclusions as factual determinations
> that are reviewed solely for clear error. Thus, in <u>Aldus</u> we stated:
>> Whether the performance of an attorney falls below the
>> standard is a question of fact. "We will not overturn a post-conviction
>> court's determination as to the effectiveness of trial counsel unless it
>> is clearly erroneous and there is no competent evidence in the record
>> to support it." Likewise, the finding of whether the petitioner was
>> prejudiced by her attorney's error is a factual finding reviewed for
>> clear error.
> 2000 ME 47, ¶ 14, 748 A.2d at 468 (quoting <u>Tribou v. State</u>, 552 A.2d 1262,
> 1264-65 (Me.1989)) (citations omitted).
>> The State essentially argues that we should adopt a bifurcated
>> standard of appellate review, reviewing the post-conviction court's factual

---

[4]      McGowan argues in his amended petition that the Maine Law Court erroneously applied
<u>Strickland</u> because it held him to a higher burden of proof than required by <u>Strickland</u>.  (Am. Sec. 2255
Mem. at 53-56, Doc. No. 21-3.)

> findings for clear error and its legal conclusions de novo with respect to both
> analytical prongs. Because we conclude from the post-conviction record in
> this case that the court's application of the second prong regarding prejudice
> was in error regardless of whether we apply the deferential clear error
> standard of review or the de novo standard, we decline the State's invitation to
> address this issue.

2006 ME 16, ¶15-16, 894 A.2d at 498.  The Maine Law Court noted that the First Circuit

Court of Appeals, "specifically held," in Ruiz v. United States, 339 F.3d 39, 42 (1st

Cir.2003), "that ineffective assistance of counsel cases warrant de novo review on legal

conclusions and review for clear error on factual findings."   2006 ME 16, ¶ 14 n. 4, 894

A.2d at  497 n. 4.   This Court has already noted this dispute in Heon v. Maine, Civ. No.

80140-B-W, 2008 WL 4181970, *11 n. 3 (D. Me. Sept. 5, 2008).

     The question of how this court addresses the application aspect of 28 U.S.C.

§ 2254(d)(1)  review through the prism of Strickland when there is a decision by a post-

conviction court  that is then reversed by the state appellate court is not conceptually a

straight forward matter.  If the Maine Law Court had rested its decision on the performance

prong of Strickland this might have implicated  the post-conviction court's factual finding

apropos counsel's decision making and a client's own participation in the defense.  These

findings could well have turned on credibility determinations that the Superior Court justice

was uniquely positioned to make.   Under either the Maine Law Court's or the First

Circuit's appellate standard of review these determinations would be reviewed for clear

error.  This Court's review of these factual findings would be governed by 28 U.S.C.

§ 2254 (d)(2) and (e)(1).   As the last reasoned decision, this Court would then owe

deference to the Maine Law Court's factual 'findings,' one step removed, and these would

be  presumptively correct, at least that is what Norton v. Spencer, 351 F.3d 1, 6 (1st

Cir.2003) counsels.

However, in this case the Maine Law Court decided that it was only necessary to examine the prejudice to McGowan and did not undertake any determinative inquiry into counsel's performance.  Rather, it decided the matter on the prejudice prong of the ineffective assistance of counsel standard, a decision which did not involve credibility determinations with respect to testimony at the post-conviction hearing.  Accordingly, this Court reviews any factual 'findings' made by the Maine Law Court in its review of the trial record to ascertain whether it "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," bearing in mind that, under the § 2254(e) deferential standard, these factual determinations are presumptively correct. McGowan has the burden of rebutting this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1). With regards to the Maine Law Court's legal conclusion that no <u>Strickland</u> prejudice adhered, I apply the § 2254(d)(1) unreasonable application standard.[5]

### i. Cross-examination of State's Witness Jamie Merrill

The Maine Law Court disagreed with the state post-conviction court's conclusion with regards to a particular aspect of McGowan's attorney's cross-examination of Jamie

---

[5]     Under <u>Ruiz</u>, the First Circuit would review this legal conclusion made by a District Court judge in the context of a federal prosecution <u>de novo</u>; the Maine Law Court persists in suggesting that clear error review would be the appropriate standard of review on appeal from a lower state court judgment.  As I indicated in <u>Heon</u>, that disagreement provides no guidance to this court's habeas review which is conducted pursuant to the 28 U.S.C. § 2254 statutory directives.  In this case the Law Court's findings on prejudice do not really pertain to basic, primary, or historical facts.  Rather the Law Court ultimately made a "factual" determination about what a jury *would or would not* infer from a particular fact that counsel failed to develop at trial but which was fully developed in the post-conviction factual record.  I confess to confusion in my own mind whether that "factual" determination is reviewed here as presumptively correct or whether it is actually a legal conclusion subject to the unreasonable application standard.  The Law Court's factual finding regarding the lack of record evidence about Jamie Merrill's testimony regarding prior homicides or felony convictions relating to McGowan  is, of course, presumptively correct.  I underscore that finding because it is a basic, primary, or historical fact  that McGowan has completely failed to rebut.  However, the Law Court's conclusion about what impact defense counsel's question of Merrill would have had with the jury, given the overall trial strategy, is not a basic, primary, or historical fact.

Merrill, McGowan's former girlfriend and the girlfriend of the victim at the time of the

shooting.[6]  The Maine Law Court reasoned:

> McGowan's trial attorney's cross-examination of witness Jamie Merrill
> employed a strategy of eliciting damaging statements Merrill may have
> made concerning McGowan, and then disproving the statements through
> the testimony of other witnesses. As part of this strategy, Merrill was
> asked if she remembered reporting to police that McGowan was a felon
> and that he had walked away from other murders. Rather than confirming
> that she had made statements to this effect, Merrill responded, "No."  No
> further substantive evidence was introduced by McGowan or by the State
> regarding them.[FN5]
>
>> FN5. A State Police detective confirmed that Merrill had been
>> interviewed on two occasions, and he verified certain remarks she made
>> but claimed to have forgotten. However, the detective never confirmed
>> whether Merrill had made the accusations involving prior felonious
>> conduct or homicidal involvement.
>
> The court concluded that the failure to affirmatively disprove the
> statements so as not to let the jury believe that McGowan was a convicted
> felon and had walked away from other murders constituted "a serious
> mistake which an ordinary fallible attorney would not have made."  The
> court also found that the strategy had resulted in prejudice and that
> McGowan was entitled to a new trial:
>
>> The prejudice to the petitioner as to these ... accusations is
>> obvious. Merrill accused him of being a felon and involved in prior
>> homicides for which he had escaped liability. The jury was left
>> with these unrebutted claims, and, if believed by them, would have
>> so tainted the petitioner that his trial must be seen as fundamentally
>> unfair.
>>
>> Because counsel was ineffective in this important respect
>> and prejudice likely resulted, the petitioner is entitled to a new trial
>> and the amended petition will be granted on this basis.
>
> The trial attorney's cross-examination strategy of seeking to elicit
> testimony from Merrill that was damaging to McGowan, and then
> disproving it in order to present Merrill as incredible, was surely apparent
> to the jury. The attorney's failure to introduce follow-up evidence with
> respect to the two questions that involved statements that Merrill had no
> memory of *and, therefore, did not confirm the truth of,* would not have led
> a reasonable jury to conclude that the statements were, in fact, true.
> Contrary to the court's conclusion, no evidence introduced at trial
> suggested that Merrill had accused McGowan of being a felon and
> involved in prior homicides. Rather, she testified that she did not

---

[6]      I say particular aspects because McGowan made other challenges to his attorney's cross-examination of Merrill that the post-conviction court rejected and which were not carried forward by McGowan in his appellate pleadings to the Law Court.

remember making such accusations to the police. There was no other evidence submitted at trial suggesting that she had.

In addition, these questions were but two of many questions McGowan's trial counsel asked in his effort to discredit Merrill's credibility.[FN6] Considered in the context of the entire cross-examination, the trial attorney's failure to rebut the accusations that McGowan was a felon and had walked away from other murders was unremarkable, especially because Merrill did not claim to have made such accusations.

> FN6. McGowan's trial attorney successfully disproved Merrill's pre-trial accusations that McGowan had sent her a threatening letter, conspired with the trial attorney to commit the murder, and owned many guns and hand grenades. The trial attorney also attempted to impeach Merrill's testimony on other matters, including the timing of the gunshot and her bias against McGowan.

Accordingly, even if it is assumed that the trial attorney's failure to revisit these questions constituted ineffective assistance, the resulting prejudice, if any, was insubstantial and did not deprive McGowan of a fair trial. Under either a clear error or de novo standard of appellate review, we cannot affirm the court's contrary conclusion.

McGowan, 2006 ME 16, ¶17-21, 894 A.2d at 498-99.

In sum, with respect to the Maine Law Court's prejudice analysis it 'found' as a fact that Merrill only testified that she did not remember making the comments that McGowan was a felon and that he walked away from murder.  The Maine Law Court concluded that there was no evidence at trial suggesting that Merrill had actually made these accusations.[7]

In juxtaposition, the post-conviction court asserted that McGowan's attorney could have disproved Merrill's claims, stating: "This could have been accomplished easily but was overlooked."   (Dec.& Order at 32, State App. C.)    Beyond the portion of

---

[7]        In his amended memorandum in support of his claims McGowan's argument also focuses on his attorney's performance and asserts that eliciting this testimony cannot be deemed a trial strategy.  (Am. Sec. 2254 Mem. at 56-57.)  Most certainly this line of testimony was a trial strategy and could have been a most effective strategy for undermining the witness's credibility.  What the Law Court does not address is that McGowan is arguing that his attorney should have assured that evidence that McGowan did not have any criminal record of this sort was admitted into evidence after he opened the door by asking Merrill this question.  The Law Court highlights that the trial strategy of counsel in discrediting Merrill by this approach of questioning "was surely apparent to the jury."  Does not that make it even more important for counsel to assure that he also discredited these alleged comments by Merrill once he exposed the jury to Merrill's supposed representation as to McGowan's criminal history?  This is exactly the point made by the post-conviction court in the passage excerpted below.

its decision highlighted by the Maine Law Court, the post-conviction court had concluded

with regards to prejudice that the failure to disprove Merrill's claims,

> left the jury with the understanding that McGowan might have been a
> convicted felon, and, therefore, could not legally have possessed firearms,
> and might also have been implicated in other homicides.  As bad, the jury
> might have believed that McGowan was a criminal, and not subject to
> belief – an important factor in a case where he was the sole witness who
> could support his self-defense claim.  An attentive jury, seeing that
> [defense counsel] disproved Merrill's other accusations concerning
> McGowan, could reasonably have understood that his failure to disprove
> these claims means they might have been true.

(Id.)  This is the portion of the Superior Court's justice opinion that the Maine Law Court

rebuffed by its conclusion: "The attorney's failure to introduce follow-up evidence with

respect to the two questions that involved statements that Merrill had no memory of *and,*

*therefore, did not confirm the truth of,* would not have led a reasonable jury to conclude

that the statements were, in fact, true."

   In his amended 28 U.S.C. § 2254 memorandum McGowan addresses the Maine

Law Court's prejudice determination by asserting that Merrill's profession of a lack of

memory did not disprove the truthfulness of the accusations.  "In fact," McGowan opines,

"it's possible that the jury infer[r]ed that by testifying that she did not recall making the

accusations that she was protecting me, leading the jury to believe that the accusations

about my being a convicted felon, commit[t]ing prior murders, making threats to her and

having hand grenades were, in fact, true and worth considering."  (Am. Sec. 2254 Mem.

at 58.) He also argues that his attorney referred to these accusations in closing argument –

arguing that McGowan had never killed anyone before --  and that the jury could have

understood this closing argument to be a substantiation of the accusations because

Merrill's accusations were never disproved during the evidentiary portion of the trial. (Id. at 59-60, 66.)

Reading these three interpretations of the impact of this testimony on the jury highlights the speculative nature of the after-the-fact/verdict inquiry into the impact an attorney's examination of a witness did have or might have had on the jurors.  "[Q]uite obviously, reasonable minds can differ," Heon v. Maine, Civ. No. 80140-B-W, 2008 WL 4181970, *11  (D. Me. Sept. 5, 2008), as punctuated by contradictory conclusions of the post-conviction court and the Maine Law Court.   But in terms of prejudice, not performance, in this case the Maine Law Court's factual focus and the legal conclusion apropos the Strickland prejudice prong survive § 2254 scrutiny because I cannot say that the Law Court's view of what a reasonable jury would have done with this faux pas on counsel's part was an unreasonable application of Strickland.

### ii.    Failure to Present Blood Spatter Expert Witness

The second aspect of counsel's performance that the post-conviction court felt warranted a new trial was counsel's failure to present the testimony of a blood spatter witness.  In advancing this claim in front of the post-conviction court, post-conviction counsel submitted a report by Ross Gardner, a certified senior crime scene analyst from Georgia.   The state post-conviction court explained its conclusion as follows, referring here to reports filed by the State's expert and McGowan's expert[8] as part of the post-conviction proceedings:

---

[8]             McGowan's post-conviction expert, Ross Gardner submitted a report to post-conviction counsel that included the following information on the blood spatter evidence and the victim's position:
    Although the documentation is minimal, I was able to form some limited opinions regarding the crime scene and specifically the bloodstain patterns found therein. …
        The pattern depicted on Photo A-2 of the documentation is a spatter pattern.  It is not, as testified to by Dr. Fernec, a castoff pattern.  This was a significant misrepresentation of the pattern.  The pattern exhibits the classic characteristics of impact

17

spatter … [T]he only viable source of this spatter pattern is the gunshot entry wound in the victim's head (back spatter). … At the time of the event, the victim's head would have been below 48", the entry would oriented almost in line with the ground plan and facing somewhat toward or at least aligned with the East wall. The victim's body position would have to be between the northern most point of the pattern and the doorway. Based on the Detective's measurements, such a position would put him literally at or near the entry threshold.

There are additional spatter evident on the victim's left leg (Photo Q). Although not documented appropriately, it is evident that spatter are moving from the victim's right front, rearward onto the inseam. These spatter are not diluted and are likely associated to the victim's exit wound (Forward spatter) on the left neck.

Together these two stains suggest an odd physical position, one which is certainly not upright at the moment of wounding. The best description would be one of a squat with the head down and upper chest oriented forward (south) of the lower torso and legs.

…

If it were considered of importance, it might be possible to further define the area of origin of the spatter pattern on the East kitchen wall. The single photo provided includes enough spatter stains and a generalized reference mark… This will be difficult due to the lack of appropriate crime scene photos and documentation, but at a minimum, it would place the victim's head in a slightly more defined area at the moment of wounding.

(Gardner Report at 1-3, State App. C.8.)

The Maine State Police "Blood Pattern Analysis Report" reads, as applicable to the position of the victim when he was shot:

Based on the impact spatter pattern characteristics and relative placement of the bullet wounds, it is most likely the origin of the spatter distributed on the East wall came from the entrance wound to the right side of the decedent's head.

This impact spatter pattern was not documented in its entirety but examination of a mid-range photograph included scale and reference point[s] including height from floor/distance from doorway make it possible to estimate an approximate area of the decedent's head at the moment he sustained the gunshot wound. Based on these measurements the decedent's head was northerly and downward from this pattern, approximately 3 to 3 ½ feet above the floor and approximately within 1 foot or so from the doorway.

This would place him in a low stooped position with his head bent toward his left shoulder and facing the East wall. Body rotation variations make approximate placement of the torso less precise but regardless of the angle the anterior aspect would be toward the East wall.

A central question raised in this case was if any determinations could be made not solely on body placement but on actions of the decedent immediately prior to sustaining the gunshot wound. Specifically, if body placement relative to the scene could indicate if the decedent may have been lunging the defendant or ducking, crouch, etc. Caution must be exercised when considering this question for obvious reasons. Analysis of the physical evidence in this case cannot answer precisely what the decedent's body position meant in terms of his intended actions immediately prior to the gunshot.

It is my opinion it is highly unlikely the decedent was rushing/lunging the defendant immediately prior to the gunshot based on his head and body position relative to the scene. The decedent was within a confined narrow corridor running North/South yet facing in the general direction of the East wall and close to the door. The defendant was South and East of the decedent with the stove probably in between the two (based on angle limitations). If the decedent were lunging he would have had his face turned away toward the door with his anterior turned East while traveling in a southerly direction

18

The significance of McGowan's defense of [the victim] being in a crouched position is that it would demonstrate that he was the aggressor, coming at McGowan.  According to Mr. Garner, he would not be able to assist with such a claim, because "Bloodstain pattern analysis however will not define whether the victim was 'lunging'.  Nor will it define the victim as aggressor; that simply isn't possible."  The best Garner could offer was that [the victim's] head would be below 48 inches and would have him in "an odd physical position, one which is certainly not upright at the moment of wounding.  The best description would be one of squat with the head down and upper chest oriented forward (south) of the lower torso and legs."

The State's [post-conviction] expert offered a similar opinion advising that Brown was "in a low stooped position" with his head "approximately 3 to 3 ½ feet above the floor." Like Garner, he offered that "[a]nalysis of the physical evidence in this case cannot answer precisely what the decedent's body position meant in terms of his intended actions immediately prior to the gunshots."

Thus, what may be learned from the experts is that [the victim] was in either a "squat" or "stooped" position when he was shot.  Such might support McGowan's contention that [the victim] was in a crouched position as though he were an aggressor.  It might also support a finding that Brown was ducking when confronted with a man pointing a gun at him.

The latter theory has never been advanced, but the former would support McGowan's trial testimony that [the victim] was crouched as though to attack him.  Because McGowan was the only witness for the defense who could describe facts which would substantiate self-defense, his credibility was of high importance on this central issue in the trial.  Thus, where physical evidence and its analysis would tend to support his claim, the failure to investigate and secure expert testimony in this regard would meet both prongs of the deprivation of effective counsel test.

That is to say, the petitioner's ability to support a substantial ground of defense was compromised by defense counsel's failure to retain an expert[,] [s]uch as Mr. Garner, whose analysis and testimony could fairly be interpreted to corroborate McGowan's only defense.  This is true, even though Garner could not testify that [the victim] was acting aggressively and that another explanation for the deceased's body position could be offered.

---

toward the defendant.  This is in no way similar to what would be described as a forward lunging movement.

Dr. Fernec testified that the decedent would have immediately collapsed upon sustaining the gunshot wound.  The impact spatter near the door, decedent's approximate position during impact, and pool of blood located on the floor nearby indicate there was little, if any, locomotion from the decedent at the moment the gun was fired.
(Leighton Report at 1-2, State App. C.8.)

(Dec.& Order at 36-37, State App. C) (record and case citations and footnote omitted).  In a footnote the post-conviction court noted that the State expert indicated that it was highly unlikely that the victim was "'rushing/lunging the defendant immediately prior to the gunshot based on his head and body position relative to the scene.'"  (Id. at 37 n. 10.)

As to this issue, the Maine Law Court summarized its reasoning:

> The court found that McGowan's blood spatter expert witness would have corroborated portions of McGowan's trial testimony. Specifically, the court found that the blood spatter expert would have "support[ed] McGowan's contention that [the victim] was in a crouched position as though he were an aggressor" about to attack him. The court also observed that this evidence "might also support a finding that [the victim] was ducking when confronted with a man pointing a gun at him." The court concluded that "where physical evidence and its analysis would tend to support his claim, the failure to investigate and secure expert testimony in this regard would meet both prongs of the deprivation of effective counsel test." The court reasoned that "[t]his is true, even though [McGowan's blood spatter expert] could not testify that [the victim] was acting aggressively and that another explanation for the deceased's body position could be offered."

> The State argues that McGowan's expert's testimony would have contradicted portions of McGowan's trial testimony. The State notes that both blood spatter experts opined that the bloodstains on the wall were caused from the gunshot entrance wound. Accordingly, the State asserts that the victim must have been facing away from McGowan when he was shot because the entry wound was, according to the medical examiner, above and behind the victim's ear. The State also contends that the court's emphasis on whether the victim was crouching is irrelevant, and that the court's factual finding that McGowan's expert's testimony would have corroborated McGowan's is clearly erroneous. Accordingly, the State argues that the court erred as a matter of law in concluding that McGowan was denied effective assistance of counsel.

> McGowan acknowledges that the testimony of his post-conviction blood spatter expert witness does not establish that the victim had attacked him but only suggests that the victim was squatting or crouched when shot. McGowan's blood spatter expert reported that the blood patterns represent "an odd physical position, one which is certainly not upright at the moment of wounding. The best description would be one of a squat with the head down and upper chest oriented forward (south) of the lower torso and legs." McGowan argues that a jury could have concluded from such evidence that the victim was trying to tackle or lunge at him, and could have reasonably believed McGowan's version of the facts.

20

Consequently, McGowan contends that he was denied effective assistance of counsel.

McGowan's and the State's post-conviction experts' reports both suggest that the victim was in a crouched position, and both agree that the victim's precise position cannot be determined, although the State's expert opined that "it is highly unlikely the decedent was rushing/lunging the defendant immediately prior to the gunshot." Accordingly, the State's assertion that the evidence can only point to the conclusion that the victim was facing away from McGowan is not supported by the record. Nonetheless, the fact that the victim might have been in a crouched position, as opposed to standing upright, lends no greater support to McGowan's claim that the victim was aggressively lunging at him with a knife. Although blood spatter forensic evidence might have bolstered McGowan's testimony to some degree by corroborating his testimony that the victim was in a crouched position at the moment he was shot, it is neutral with respect to the central issue of the case: whether McGowan shot the victim in self-defense because the victim was aggressively lunging at him.

The State did not present evidence at trial that contradicted McGowan's testimony that the victim was in a crouched position at the moment he was shot.[FN7]  Accordingly, a blood spatter expert would not have corroborated McGowan's testimony as to a substantial fact that was disputed at trial. More importantly, it would not corroborate McGowan's claim that the victim was the aggressor and that he shot the victim in self-defense. McGowan's own expert conceded that blood spatter analysis cannot determine whether the victim was in an aggressive posture when shot. As the court itself observed, the fact that the victim was in a crouched position can also be interpreted to mean that the victim was ducking at the time McGowan shot him.

> FN7.  McGowan contended at the second post-conviction review hearing that the State disputed his contention that the victim was crouching. As evidence, McGowan points to closing statements made by the State, and cross-references his own description of the shooting. However, a review of the closing statements made by the State suggest that while the State *generally* asserted that McGowan's version of the events was incredible and baffling, and specifically criticized many details of McGowan's descriptions of the event, the State did not dispute his testimony that the victim was crouched. In fact, the State in closing stated that the victim's shoulder "could have been at any height."

The prejudice, if any, from McGowan's trial attorney's failure to present the testimony of a blood spatter expert witness at trial was insubstantial because the testimony could not establish that the victim was in an aggressive posture at the time he was shot. The court's finding that McGowan's trial attorney's failure to present such testimony was so prejudicial as to render the trial fundamentally unfair is not sustainable under either a clear error or de novo standard of appellate review.

McGowan, 2006 WL 16, ¶¶ 22-27, 894 A.2d at 498 -501.

In his amended § 2254 memorandum McGowan argues that the Law Court "appears to downplay the importance of raising reasonable doubt to prevent [him] from being able to reach its heightened standard of establishing prejudice."  (Am. Sec. 2254 Mem. at 61.)  He elaborates:

> My blood spatter expert's "preliminary report" clearly establish[es] that the deceased was "certainly not upright" when he was shot, but in a squat, (knees bent) head down, upper chest forward, (south towards me) of the lower torso and legs.  I submit that this position is consistent with a football player's tackling stance, this would reasonably be considered to be an "aggressive posture".  I testified at trial, (four years before the expert generated the reports) that the deceased was crouched down low like a football player lunging at me with a knife when I shot him in self-defense.

(Id.)  He complains that the State argued in closing that the deceased was standing upright.  (Id. at 62.)  He explains:

> The importance is that the jury would probably have put great weight in the fact that the State's argument that I shot the deceased from behind while he was standing, was supported by the Medical expert's testimony, and was diametrically opposite to, and thus undermined my unsupported testimony that, I shot the deceased in self-defense because he was crouched down low in front of me lunging at me with a knife.
> …
> I submit that the substantial facts disputed at trial were whether or not I committed murder, and the deceased's body position when he was shot.  Contrary to the Law Court's holding, my blood spatter expert would have offered credible testimony as to the deceased body position when he was shot.  Testimony that clearly undermined the State's expert's testimony supporting the State's argument that the shooting was murder – a substantial fact disputed at trial. …

(Id. at 62-63; see also id. at 68-70.)

The contrast between the post-conviction court's analysis of this issue and the Maine Law Court's reading of the record requires some considered scrutiny of the record by this Court.

At trial the State's forensic expert was questioned and testified as follows:

22

Q.      …Could you tell the jury roughly the point of entry?  You might
want to use your own head if you feel that's an appropriate point of entry
of the injury and its trajectory through the body and where, I take it you
found the bullet in the body, where that finally came to rest in Mr.
Brown's body?
A.      Yes, sir.  The entrance wound was on the right side of the head
several inches above the ear and just slightly behind it, if you were on the
right side of the head, so that I'm pointing going up from my ear several
inches above and just going a little bit behind it pointing to the scalp,
which would be the parietal scalp.
        And the gunshot wound entered at that point entering in going
though that area of the brain called the parietal lobe passing through some
deeper structures in the brain  … passing down through the skull …and
then coming out of the left side of the neck near the base of the neck
where the neck joins the shoulder ….then was only out for a moment
before it reentered as a reentry wound into the flatter part of your shoulder
… and then ended up in the shoulder blade region where I recovered the
bullet.
….
Q.      Okay.  Now you – you have described for us the entry – its
traverse through the skull and exit and then reentry into the body of the
exit and then reentry into the body at the shoulder level, based upon your
observations and the track of the bullet as you recall it, could you give us
an approximation of the relative positions of the head and the shoulder at
the time that the bullet would have entered the body?
A.      Yes, sir.  Relative to wherever the muzzle was being held, which I
of course do not know.
Q.      Right.
A.      But the position of the body, assuming the bullet was coming from
your direction, and I was turned towards you, would mean that would have
to have my head tilted and kept my shoulder relatively upright.  It would
still be a great deal of variation of how much tilt and how wide the
shoulder is, but the head had to be tilted towards the right and the shoulder
kept relatively upright.

(Oct. 27, 1999, Trial Tr. at 39- 42.)

        On cross-examination, defense counsel and the State's expert had the following

exchange:

Q.      Can you tell from the projectile how far way the person that shot
him was?  You say there were not singe burns, so it wasn't point-blank?
A.      No, sir.  I could – well, I could tell that it wasn't something to
suggest a contact gunshot wound or a point-blank gunshot wound as

23

you're describing or contact thing, but other than that I would have to say
an indeterminate range.  I just don't know.
Q.      So you don't know if it was 5 feet, 10 feet?
A.      I don't know if it was 5 inches versus 5 feet.
Q.      Can you tell – I believe you said it was – head was up around here
and came out down here (indicating)?
A.      Yes, sir.  I was pointing to – using my ear as a reference point, go
up a few inches and go back about an inch or so, half an inch.
Q.      Could you tell what position the deceased was in?  Could you tell
if the deceased was standing up?  Could you tell if he was in a crouched
position going in?  Could you tell if he was going backward?  Could you
tell if he was sitting down?
A.      No, sir, I could only tell muzzle position relative to the body.  I
don't know how they were positioned.

Id. at 47-48.)

Clearly McGowan's ability to convince the jury that he acted in self-defense was

the pivotal issue in the trial.  He admitted that he shot the victim and he took the stand in

his own defense.  In terms of the nuts and bolts of the defense case, there was a motion in

limine pertaining to evidence that McGowan perceived the victim to be a physical threat

and that the victim had assault convictions as part of a rather extensive rap sheet. (Oct.

25, Tr. at 14- 25.)

McGowan testified as follows about what happened when the victim entered his

house:

A.      He came in, saw the gun, and he come in.  I had come out of the
living room, and he was more or less standing in the doorway outside the
house.
…
In the doorway looking in, he could see the stove, and he said, what
the fuck's the gun for.
Q.      What the fuck's the gun for?
A.      As he was coming in.
…
And I said protection, and I took it down off the stove,
brought it down to my side.
Q.      Okay.  Then what happened?
A.      He said, I should have busted your head with a bat a week ago.
….

24

Q.      Then what happened?

A.      He had a harness for a horse

…

…And I told him to take this and get out, and he said, fuck you.

…

… And took it out of my hand and kind of tossed it back.

Q.      What hand did he take it with?

A.      His left hand.

Q.      Do you know if he's right – or left handed?

A.      By discovery left-handed.

Q.      So he took the harness with his left hand?

A.      Yes.

Q.      Okay.  And what did he do next?

A.       About the same time, he come up this side with a – a knife – a silver knife.

Q.      What you thought was a knife?

A.      Yes.

Q.      Which is this?

A.      Yes.

Q.      Now, was this in his pouch, did you notice?

A.      I just saw it come from the side of his hands.

Q.      It wouldn't fit in a pouch like this, though?  It fits in like this, correct?

A.      I believe so.

Q.      But it wasn't like this when you saw it?

A.      It was like that.

….

Q.      Then what happened?

A.      As he brought it up, I told him to get out again, and I brought the gun up and took the safety up, brought the gun up, and he said something else, I don't know what he said.  Then he sort of lunged at me like a football player would.

Q.      Sort of lunged in a crouched position?

A.      Right, right.

Q.      Then what happened?

A.      When the knife come at me, I fired the gun, and he fell into the side of me.

Q.      Did you notice whereabouts in the head that you hit him, or did you notice you hit him anywhere in the head?

A.      No, I saw his hand move.

Q.      You saw his hand move?

A.      Yes.

Q.      Then what happened?

A.      I stood there for a second, and I went outside – went outside to the van, took the keys out of the van.  I didn't want Jamie to drive off and run into something.  I went up to her and told her what I did.

…

Q.      What essentially did you say?

A.      I told her I hope she was happy, I just blew his brains out.

Q.      Okay.  Why did you say that?

25

      A.     I was mad because she – that he come in instead of her.
…

(Id. at 67- 70.)  McGowan indicated that after the shooting he locked himself in the house and did not let Merrill or law enforcement officers enter because he did not want anyone shooting his dogs.  (Id. at 71-72.)  He said that he had not eaten or slept for seven or eight days because the victim had been driving up and own his street, parking outside his house, and he was worried about Merrill.  (Id. at 72, 79-80.)   He further testified that the victim had told him a week to three weeks earlier that he had charges on him because he was "going after someone with a gun downtown" and for beating his wife.  (Id. at 77.) McGowan also recounted that other people in town had told him that the victim was violent.  (Id. at 78.)  McGowan indicated that three days after Merrill left McGowan the victim had said he would kill McGowan if he interfered with him.  (Id. at 78-79.)

On cross-examination McGowan reiterated that the victim came forward towards him and further represented that at the time McGowan was backed up against the front corner of his stove.  (Id. at 81-82.)  He was questioned by the prosecutor on his representations concerning the victim's knife.  (Id. at 97-98.)  Part of this trial exchange was as follows:

      A.     When he came up with [the knife] I brought the gun up and told him to get out again.
      Q.     Okay.  Now, how much distance is there between you and him at that point?
      A.     Just a few feet.  He was coming in, so it's – it was getting less, probably 4 feet to within less than 2 probably.
      Q.     And you have your gun up like this?
      A.     No.
      Q.     I'm sorry, with your left hand?
      A.     No, I brought it –
      Q.     Like this?
      A.     Down to my side is where it was.
      Q.     Down to your side?
      A.     Yes, with your hand.

Q.      Like this?

A.       Not that high.

Q.      All right.  How's this?

A.      Well, pretty much down to my side.

Q.      Okay.  All right.  And he has this item like this?

A.      Right.

Q.      And what happens next?

A.      He lunged at me with his head down, and I don't – he said something.  I don't know what it was.

Q.      So is it fair to say you're sort of in this position here, sort of face to face.

A.      Right.

Q.       And he comes at you – well, I'm sorry.  He comes at you like this and that's when you shot?

A.      Yes.

Q.      Am I – you said a football player earlier, so you're talking like a crouch?

A.      Even lower than you are.

Q.      Okay.  He came at you like this?

A.      Lower, to be precise.  He was hunched right down.

Q.      I'm too old to get any lower, so this is going to have to be down.

A.      That's not the way he was.  He was much lower.

Q.      All right.  Fine.  But coming right at you?

A.      Yes.

Q.      And you discharged the gun?

A.      Yes, I did.

Q.      Now, when you were asked about this – you know, the police asked you several times during your questioning at the hospital what happened, how did this shooting happen, and you kept saying, well, I don't know.  You said, I don't know.  I don't remember how the gun came out.  I don't know how the shooting happened.

        Now, how could you forget something as dramatic as you have described to us, a person coming at you with what you believe is an implement, a knife, coming directly at you like a football player as you have indicated?  How did that – how were you not able to recall that at that time?

A.       At the time, I didn't want to involve Jamie.

….

Q.      And in your mind, how would that have involved Jamie?

A.      At the time, I didn't know.  Like I said, she'd always come into the house, and this time he had come in, and I didn't know if she sent him in or if it was his idea.

(Id. at 98-101.)

27

In his closing argument the Assistant Attorney General argued against the defense theory of self-defense.   He emphasized that one witness testified that he saw McGowan and the victim enter the house where the shooting took place:

> And she says, well, they walk down in there and very shortly after they disappear from view you hear this bang, and out comes the defendant with a gun in his hand and says, I hope you're F-ing happy I blew his F-ing brains out.
>
> He didn't say, he came at me, and I had to do it. I killed your – your boyfriend in self-defense.  Don't you think that that if, in fact, he had to act in self-defense he would have said it right away.  I had to do it. I had to kill him. He was coming at me.  He wanted to hurt me.  He wanted to kill me.  He didn't say that.  He just wanted to make a point to Jamie Merrill.  I hope you're happy.  I blew his brains out.

(Oct. 27, 1999, Trial Tr. at 6-7, State App. A.)   With respect to the position of the victim, he opined:

> The description of the shooting here on the witness stand I submit to you is baffling in view of the physical evidence.  My memory is that Mr. McGowan testified that the deceased came at him like a football player he said, head on like this, with this – this device, implement in his hand sort of outstretched, and he was moving towards him.  He was a couple feet from him when he shot.  Well, the entry doesn't match up with that description of the events.
>
> The entry and the trajectory of the bullet, which went from just slightly above and behind the ear, straight across cutting – and down, straight across and cutting the spinal cord, entering the shoulder, exiting here, going down into the shoulder.  And I asked Dr. Fernec I said, well, tell us what the relative position in order for that injury to have occurred as you observed during the post-mortem exam, what was the relative position of the head and the body.  And it is your memory, but my memory of what he did was he said, the head would have been tilted like this, this would have been the relationship between the – the shoulder and the head, so the bullet would be coming in and down like this.  This is the relative position of the body.
>
> Now, how do you get that kind of wound slightly to the back of the ear when you're coming head on to somebody?  How does that trajectory work?  It's almost like it's from behind, away from the side, back here. Somebody was coming at you and you're shooting, how do you end up hitting them on the side, the trajectory coming down and – down into your shoulder so that your head and shoulder would be, you know, in that position, this kind of position?  I mean, you have to shoot from the side, not from the front.  But, again, it's your memory that matters and your view of that.

(Id. at 20-21.)

For his part, defense counsel argued vis-à-vis the position of the victim:

> There's no question that [McGowan] loved Jamie [Merrill]. There's also no question that he had – this was self-defense in anybody's mind. He was in his own home, he had threatened him moments before and even threatened him when he's there, what's the gun for, to protect me. I should have hit you in the head with a baseball bat a week ago. And he comes to take the harness and he pulls it out.
>
> He gets it in a low position. He's only 5'6", so he scooches down and rushes like a football player either to tackle my guy or to stab him, and he's got his head turned. He's not going to put his head in front, and that's where the bullet goes, that's very consistent with the evidence, very consistent with what the medical examiner says and very consistent with what this defendant said because that's what happened.

(Id. at 32-33.)

The Assistant Attorney General responded in his rebuttal, that defense counsel,

> says that it is consistent with the doctor's testimony that the deceased was going at the defendant when he was shot because all he had to do was turn his head like this, but that's not what the doctor testified to. That's why I asked the doctor, I said, what would be the relative position, in other words, position in relation to one another. It would be like this, like this to the shooter, not like this. The trajectory went in above and slightly behind the ear down, across, out back, in and down again. And I said, give me the relative position. He wouldn't have been sure of the shoulder height I think he said, whether the shoulder was up like this or down.
>
> It could have been any height, but this should have been where the head would be, [vis-à-vis], the shoulder, [i]in other words, like I'm standing now with the head slightly tilted like this. Now, if you're coming at someone like that, let's say, and they shoot you, the bullet doesn't go in here and come down here. It doesn't happen. That's physical evidence. It's also common sense.

(Id. at 38.)

The above excerpts are key aspects of the trial record with regards to an analysis of the conflicting conclusions of the post-conviction court and the Maine Law Court. The Maine Law Court describes the substantial fact disputed at trial as whether or not McGowan shot his victim because he was aggressively lunging at him. It concluded that the blood spatter expert would not corroborate McGowan's claim because the evidence

would not determine whether or not the victim was in an <u>aggressive</u> posture when shot. The victim, the Law Court surmised (as did the post-conviction court), might have been ducking.  The Law Court insists that the State did not try to contravene McGowan's argument that the victim was in a crouched position when shot, but there is some question as to whether this is a reasonable reading of the trial record given the State's theory of the case, the testimony it elicited at trial on the entry wound of the bullet, and its closing and rebuttal argument. The excerpts from the prosecutor's closing and rebuttal arguments set forth above demonstrate that the State certainly was trying to discredit McGowan's version of events and convince the jury that the shooting was not in self-defense.[9]  As the post-conviction court concluded, the presentation of the blood spatter evidence included in the Gardner report would have supported McGowan's testimony.  The State's blood spatter expert would not have been able to rebut the evidence that the victim was crouching, his report indicated that the victim was in a "stooped position" with his head approximately 3 to 3 ½ feet above the floor.  <u>See</u> <u>supra</u> footnote 8.  There can be no dispute that the inclusion of this blood spatter evidence at trial would not have miraculously made McGowan's case for self-defense (or adequate provocation) a slam dunk.

With regards to what the record tells us about the jury deliberations, the jury commenced deliberations at 4:00 p.m.  At 4:20 p.m. the court indicated to counsel that the jury requested a list of possible verdicts with an explanation of each.  (Oct. 27, 1999, Tr. at 166.)  At 5:42 p.m. the jury sent another note indicating that it wanted an explanation/reminder of "one, intentional or knowing murder, two, adequate provocation

---

[9]      The Maine Law Court references the rebuttal concession that the victim's shoulder could have been at any height as evidence that the State was not trying to controvert McGowan's testimony that the victim was in a crouched position.

manslaughter, three, reckless or criminally negligent manslaughter."  (Id. at 168.)  At 5:55 p.m. the jury was brought back into the courtroom and the court reread the instructions including his instructions on self-defense and defense of the premises, which took until about 6:20 p.m., at which point the jury was told that dinner would be brought in and that the foreman should notify the court on that score by a note.  (Id. at 169-87.) At 7:58 p.m. there was another chambers conference and the judge and parties agreed to send a note to the jury stating that it was probably too late to order dinner in and would the jury like to continue deliberations tonight or return the next day.  (Id. at 189.)   The jury elected to return the next day and were told to return by 8:30 a.m.  (Id. at 190.)  At 11:00 a.m. the next morning the jury returned a verdict of guilty for intentional and knowing murder.  (Oct. 28, 1999, Tr. at 1- 2.)

The Maine Law Court concluded that the inability of forensic evidence to prove that the victim was aggressively lunging and the State's statement in rebuttal that the victim "could have been at any height" means that there was no prejudice to the defense in not being able to prove at trial that the victim was at a crouching height. However, if defense counsel had produced expert blood spatter evidence that the victim was at a crouching height and, as demonstrated by the State's own expert report during the post-conviction proceedings, the report of the State would support a conclusion that the victim's head was three to three and a half feet from the floor, the State could not have argued that McGowan's description of the victim was "baffling in view of the physical evidence."   With respect to the absence of proof that the victim was being aggressive at the time of the shooting (or that McGowan had a legitimate reason to perceive a threat) the defense did have McGowan's un-rebutted testimony that he had specific reason to fear

the victim.[10]   I recognize the Maine Law Court decided this on the prejudice prong, but

it is hard to overlook the real performance shortfall here given the importance of any

physical evidence to support McGowan's claims concerning the behavior of the victim

right before the shooting.  Nevertheless, the Law Court's conclusion that the failure to

include this blood spatter evidence was insubstantial because it would not have

established conclusively established the victim was in an aggressive posture is not an

unreasonable application of the Strickland prejudice prong.

### 3. *Second Post-conviction Review Proceedings  - Grounds 1-9 and 24  and Grounds 22 and 25 and McGowan's Cause and Prejudice Argument*

Ten of McGowan's grounds in his amended 28 U.S.C. § 2254 petition are indentified

by the State as pertaining to his second post-conviction proceedings.  These grounds are:

- 1. The state Superior Court violated McGowan's rights by summarily dismissing his second state petition for post-conviction review without considering whether he was deprived of the effective assistance of counsel during his first post-conviction review proceedings; whether those proceedings violated his right to due process of law and the equal protection of the laws; and whether the state post-conviction review statute was unconstitutional because it precluded him from filing a second state post-conviction review petition in violation of his right to equal protection of the laws.
- 2. The state Superior Court's summary dismissal of his second state petition for post-conviction review without considering the merits constituted a violation of his right to be heard and his right to equal protection of the laws.
- 3. The state Superior Court proceedings during his first state post-conviction review were "incomplete, unfair, and ineffective to protect his rights; since the court summarily dismissed his second post-conviction without considering this claim, the entire state post-conviction review process was ineffective in protecting his rights.
- 4. The Maine Law Court misstated the facts in its orders denying a certificate of probable cause to appeal the Superior Court's summary dismissal and denying McGowan's motion for reconsideration because, contrary to the representation in  orders, the Superior Court had not

---

10          (See April, 28, 2005, Dec. and Order at 8, State App. C.)

reached the merits of McGowan's claim that his post-conviction counsel's representation was ineffective.

- 5. The Maine Law Court's orders violated his right to due process and to equal protection of the laws because it ignored case law from other jurisdictions holding that a second post-conviction review process is necessary to ensure that the first post-conviction proceeding complied with due process.
- 6. The Maine Law Court's orders established that the entire state process was ineffective to protect his rights.
- 7. The Maine Law Court's orders violate his right to an effective remedy to redress the ineffective assistance of counsel he received at trial and on appeal, and his rights to due process and to the equal protection of the laws.
- 8. Essentially repeats the allegations previously made in grounds 1, 4, and 5 of the amended petition.
- 9. The state post-conviction review statute violates his right to due process of law and to equal protection of the laws by preventing a review of the first post-conviction review proceedings.
- 24.  Reserves the right to allege additional grounds arising out of the second state post-conviction review proceedings.

It is the State's argument that these grounds cannot be addressed by this Court because the Maine courts rejected them on the basis of an "independent and adequate state law ground" – to wit, it is impermissible under state law to use a post-conviction proceeding to challenge the propriety of an earlier post-conviction proceeding.

McGowan is arguing that the state post-conviction proceedings were not "adequate" to protect his rights and that these grounds should be addressed by the federal court.  In this sense the tenability of these grounds is closely tied to the remaining issues in McGowan's petition.  In his twenty-second ground McGowan argues that the state trial and appellate processes were ineffective to protect his rights and in his twenty-fifth ground he asserts that the entire state court proceedings were insufficient to protect his rights. Throughout his pleadings runs a theme that the process afforded by the State of Maine with regards to both his state post-conviction proceedings was so deficient that it violated his rights to due process.

The Superior Court justice concluded vis-à-vis McGowan's second post-conviction petition:

> Petitioner filed this petition for post-conviction review on December 1, 2006. Petitioner alleges "seven grounds of ineffective Trial, Appellate and Post Conviction Counsel." After reviewing each of the grounds, it appears to the court that Petitioner's allegations of ineffective assistance of counsel are all related to the performance of Petitioner's post-conviction review counsel. Petitions for post-conviction review provide "the exclusive method of review … of post-sentencing proceedings." 15 M.R.S.A. § 2122. Further, "post-sentencing proceedings" are defined as "a court proceeding or administrative action occurring during the course of and pursuant to the operation of a sentence that affects whether there is incarceration or its length." Id. § 2121(2). Post-conviction proceedings, however, are not encompassed within this definition, as they "[do] not directly cause nor add to the length of incarceration." McEachern v. State, 456 A.2d 886, 890 (Me. 1983). A claim of ineffective assistance of counsel during a prior post-conviction review matter, therefore, is not grounds for a subsequent post-conviction review proceeding.

(Dec. 22, 2006, Order at 2 (footnote omitted), State App. E.) In a footnote the justice added: "Even if Petitioner is trying to allege that he received ineffective assistance of trial and appellate counsel, he is barred from doing [so] here, as any grounds for relief that are raised in a prior petition cannot be raised in a subsequent petition. 15 M.R.S.A. § 2128(3)." (Id. at 2 n.2.)

McGowan moved for reconsideration of this order. He explained that his second post-conviction petition was "intended to attack the underlying criminal judgment via [his] assertion that [his] first post conviction proceeding did not comport with Due Process." (Jan. 10, 2007, Mot. Reconsideration at 5, State App. E.) He made it clear that his due process claim is premised on his assertion that his attorney in the first post-conviction proceeding was ineffective. (Id. at 6.) He asserted that the Maine Constitution and related case law establish that he is entitled to effective assistance of post-conviction counsel. (Id at 7.) The Superior Court justice rebuffed him as follows:

34

> In support of his motion to reconsider, Petitioner states:  "my post conviction attorney's ineffectiveness throughout the first post-conviction proceeding eviscerated any possible due process in the proceeding."  In support of his contention, Petitioner cites language from the McEachern dissent:  "Only a post-conviction proceeding which comports with due process can be said to preclude subsequent post-conviction attack on the criminal judgment." [456 A.2d] at 890-91 (citing Brine v. State, 232 A.2d 88 (Me. 1967)).  Although the court acknowledges the importance of this language, it is bound to follow the McEachern majority and concludes that Petitioner cannot raise challenges on post-conviction review that arise out of circumstances of a previous post-conviction proceeding.

(Mar. 27,  2007, Order at 2-3, State App. E.)

The Maine Law Court denied McGowan a certificate of probable cause, stating:

> We have reviewed the judgment in the Superior Court, and have fully considered the petition and its request for a certificate of probable cause, as well as the accompanying memoranda.  The petitioner contends that the Superior Court erred or exceeded its discretion in concluding that McGowan was not denied effective assistance of counsel in post-conviction proceedings. We find no error, factual or legal, in that conclusion.  Based on our review, we determine that no further hearing or other action is necessary to a fair disposition of the matter.

(Sept. 12, 2007, Order at 1, State App. F.)  Again, McGowan moved for reconsideration, again without success; the Maine Law Court denied reconsideration finding no merit in the motion.  (Mar, 21, 2008, Order at 1, State App. F.)

McEachern v. State  addressed the "novel question" of whether the Maine post-conviction statutory scheme "confer[s] upon the Superior Court the authority to review a prior post-conviction proceeding?"   456 A.2d 886, 889 (Me. 1983) (footnote omitted). The Maine Law Court reasoned:

> Section 2124 of 15 M.R.S.A. sets forth the jurisdictional prerequisites for a post-conviction proceeding. Such an action must involve a challenge to either a "criminal judgment causing a present restraint" or a "post-sentencing proceeding" which imposes incarceration or increases the term of incarceration. Petitioner does not argue, nor could he argue, that he is challenging the underlying criminal conviction.[FN7] Rather, he maintains that the jurisdictional prerequisite is met because post-conviction review constitutes a "post-sentencing proceeding" within the scope of section 2124.

Section 2121(2) of 15 M.R.S.A. defines the term "post-sentencing proceeding" as:

> [A] court proceeding or administrative action occurring during the course of and pursuant to the operation of a sentence which affects whether there is incarceration or its length, including revocation of parole or entrustment of a juvenile, failure to grant parole or an error of law in the computation of a sentence. It does not include administrative disciplinary proceedings resulting in a loss of time deductions under Title 17-A, section 1253, subsection 5, revocation of probation or proceedings before the Appellate Division of the Supreme Judicial Court pursuant to chapter 306.

> The State argues that a prior post-conviction proceeding is fundamentally unlike those proceedings specifically enumerated in the statutory definition. "Whether the expression of one thing is to operate as the exclusion of another, is ordinarily a question of intention, to be gathered from an examination of all parts of a statute by the aid of the usual rules of interpretation." City of Portland v. New England Telephone and Telegraph Co., 103 Me. 240, 249, 68 A. 1040, 1043 (1907). Examination of Chapter 305-A, and, in particular, sections 2121(2) and 2124 convinces us that post-conviction review is not included within the definition of a post-sentencing proceeding. Although post-conviction review may terminate incarceration or indirectly affect the length of the petitioner's sentence, unlike each of the proceedings enumerated in section 2121(2), it does not directly *cause* nor *add* to the length of incarceration. Similarly, the jurisdictional requirement of a "present restraint or other specified impediment" in section 2124 is limited to "incarceration or increased incarceration [when] imposed pursuant to a post-sentencing proceeding ...."

Id. at 890 (footnote omitted).  There was a dissent:

> The Court errs, in my view, as a result of an inappropriate separation of the issues raised by the allegations in the petition. The Court says that, absent extenuating circumstances, all issues which could have been raised in a prior post-conviction proceeding are barred by 15 M.R.S.A. § 2128(3). The Court then, by a narrow reading of the post-conviction review statute, disposes of the very allegations which may supply the extenuating circumstances. As a result, the Court affirms the summary dismissal of the petition.

> I do not question the legitimate purpose of section 2128(3) to prevent piecemeal attack upon criminal convictions. The concept of issue preclusion by waiver existed in our prior statute, 14 M.R.S.A. §§ 5502 and 5507, and has been applied by prior decisions of this Court. Shorette v. State, 402 A.2d 450 (Me.1979); Mottram v. State, 263 A.2d 715 (Me.1970). We have previously recognized, however, that only a post-conviction proceeding which comports with due process can be said to preclude subsequent  post-conviction attack on the criminal judgment. Brine v. State, 232 A.2d 88 (Me.1967). The allegation of flaws in a prior post-conviction proceeding may serve to avoid the bar of section 2128(3). In Nadeau v. State, 232 A.2d 82 (Me.1967) we decided that a change in the law was a sufficient basis to avoid waiver even though no such basis was specifically alleged.

36

Id., at 890 -91.

With regards to the underlying merits of these grounds, McGowan has not raised a claim that this determination is "in violation of the Constitution or laws or treaties of the United States."  See 28 U.S.C. § 2254(a).   The United States Supreme Court has made it clear that there is no federal constitutional right to counsel with respect to post-direct appeal state discretionary review proceedings:

> We have never held that prisoners have a constitutional right to counsel when mounting collateral attacks upon their convictions, see Johnson v. Avery, 393 U.S. 483, 488 (1969), and we decline to so hold today. Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further. Thus, we have rejected suggestions that we establish a right to counsel on discretionary appeals. Wainwright v. Torna, 455 U.S. 586  (1982); Ross v. Moffitt, 417 U.S. 600  (1974). We think that since a defendant has no federal constitutional right to counsel when pursuing a discretionary appeal on direct review of his conviction, a fortiori, he has no such right when attacking a conviction that has long since become final upon exhaustion of the appellate process. See Boyd v. Dutton, 405 U.S. 1, 7, n. 2,  (1972) (POWELL, J., dissenting).

Pennsylvania v. Finley, 481 U.S. 551, 555 (1987); id. at 556  ("Respondent apparently believes that a "right to counsel" can have only one meaning, no matter what the source of that right. But the fact that the defendant has been afforded assistance of counsel in some form does not end the inquiry for federal constitutional purposes. Rather, it is the source of that right to a lawyer's assistance, combined with the nature of the proceedings, that controls the constitutional question. In this case, respondent's access to a lawyer is the result of the State's decision, not the command of the United States Constitution.") "Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." Coleman v. Thompson, 501 U.S. 722, 752 (1991) (citing

Wainwright v. Torna, 455 U.S. 586 (1982)).[11] See also Barbour v. Haley, 471 F.3d 1222, 1231 -32 (11th Cir. 2006).

With respect to McGowan's complaint that taking the state post-conviction process as a whole he was denied due process, this is a patently frivolous argument. A post-conviction civil proceeding is,

> a collateral attack that normally occurs only after the defendant has failed to secure relief through direct review of his conviction. States have no obligation to provide this avenue of relief, cf. United States v. MacCollom, 426 U.S. 317, 323 (1976) (plurality opinion), and when they do, the fundamental fairness mandated by the Due Process Clause does not require that the State supply a lawyer as well.

Finley, 481 U.S. at 557 (emphasis added). With respect to the process received by McGowan the state court record is a testament to a process afforded him that was far beyond his United States constitutional due.

## Conclusion

Based upon the foregoing, I recommend that the State's motion to dismiss be granted and the petition denied. With regards to the question of whether or not the court should entertain a request for a certificate of appealability, the divide between the superior court and the Maine Law Court on the issue of ineffective assistance of trial counsel for not obtaining a blood spatter expert or establishing his client's lack of prior homicide and felony convictions may be indicative of an issue worthy of appeal pursuant

---

[11]     McGowan argues in his reply that he can assert that his post-conviction attorney's failings can be leverage for a "cause" determination apropos the cause and prejudice showing for excusing the procedural default. See Dretke v. Haley, 541 U.S. 386, 393 (2004). In Coleman the Supreme Court explained as to just such an argument:   "Because Coleman had no right to counsel to pursue his appeal in state habeas, any attorney error that led to the default of Coleman's claims in state court cannot constitute cause to excuse the default in federal habeas. As Coleman does not argue in this Court that federal review of his claims is necessary to prevent a fundamental miscarriage of justice, he is barred from bringing these claims in federal habeas."  501 U.S. at 757.   Having concluded that these claims do not present a justiciable issue under 18 U.S.C. § 2254(a), I do not reach the State's argument that the McEachern rule is an independent and adequate state law ground or the attendant argument by McGowan that he has established "cause."

to  28 U.S.C. 2253(c).   While I have concluded that the Law Court's final analysis was

not an "unreasonable application" of the Strickland prejudice prong, others might see it

differently.

NOTICE

A party may file objections to those specified portions of a
magistrate judge's report or proposed findings or recommended decisions
entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by
the district court is sought, together with a supporting memorandum,
within ten (10) days of being served with a copy thereof.  A responsive
memorandum shall be filed without ten (10) days after the filing of the
objection.

Failure to file a timely objection shall constitute a waiver of the
right to *de novo* review by the district court and to appeal the district
court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

October 6, 2008